Filed 3/17/14  P. v. Williams CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | A136141 |
| v. | (Alameda County Super. Ct. No. 166254) |
| QUINTON WILLIAMS, | |
| Defendant and Appellant. | |
| _____/ | |

A jury convicted appellant Quinton Williams of the first degree murder (Pen. Code, § 187, subd. (a)) of Isom Rodgers and found true various sentencing enhancements (Pen. Code, §§ 12022.5, 12022.53, 12022.7). The jury acquitted appellant of the murder of Sedrick Osorio and of other charges arising out of Osorio's death. The trial court sentenced appellant to state prison.

On appeal, appellant contends the court erred by: (1) denying his motion to sever the charges relating to Osorio; (2) admitting a deceased law enforcement officer's preliminary hearing testimony at trial pursuant to Evidence Code section 1291;[1] (3) admitting evidence he "had a lot of guns" and refusing to give a limiting instruction about that evidence; (4) admitting evidence regarding witness intimidation; (5) striking his

---

[1]     Unless otherwise noted, all further statutory references are to the Evidence Code.

1

argument regarding the prosecution's failure to obtain eyewitness testimony of the Rodgers murder; and (6) refusing to discharge a juror for actual bias.

We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We provide an overview of the facts here and additional factual and procedural details as germane to the discussion of appellant's specific claims.

The People charged appellant with the first degree murder of Rodgers on January 5, 2003 (Pen. Code, § 187, subd. (a) (Count One)), the first degree murder of Osorio on September 19, 2009 (Pen. Code, § 187, subd. (a) (Count Two)), assault with a firearm (Pen. Code, § 245, subd. (a)(3) (Counts Three & Six)), shooting at an occupied motor vehicle (Pen. Code, § 246 (Counts Four & Five)), and possession of a firearm by a felon (former Pen. Code, § 12021, subd. (a)(1) (Count Seven)). The information alleged various sentencing enhancements (Pen. Code, §§ 12022.5, 12022.53, 12022.7).

On the afternoon of January 5, 2003, Rodgers — also known as "Tank" — was shot on West Street in Oakland. He died of multiple gunshot wounds, including wounds to his back, forearm, and hands. The absence of gun powder burns on Rodgers's body suggested the shooter fired the weapon from a distance. A crime reconstruction and ballistics expert determined the shooter fired from behind Rodgers. Police officers found nine-millimeter and .40-caliber casings at the crime scene. They canvassed the area after the shooting but could not locate witnesses.

*Donna Davis's Interviews with Police and Her Trial Testimony*

Oakland Police Sergeants Mark Dunakin and Derwin Longmire interviewed Donna Davis, Rodgers's girlfriend, on the day of the shooting. Davis, who told the officers her name was Tamika Green, said she and two other women — Monique Wells and Wells's little sister — were standing with Rodgers on the sidewalk on West Street when a tan Buick parked in front of them. Appellant was in the driver's seat and two other men — "Beam" and "Rock" — were passengers. Davis had known appellant, whom she called "Q.J.," since middle school.

2

Appellant and his companions got out of the Buick. Rodgers stepped off the sidewalk and into the street. Appellant, Beam, and Rock formed a semi-circle around Rodgers; appellant stood in the middle, facing Rodgers. Suddenly, appellant pulled a "black police-type pistol" from his waistband, pointed it at Rodgers, and fired. As Rodgers tried to run away, appellant and his companions continued to shoot at him. Rodgers collapsed near the corner of West and 31st Streets and appellant and the other two men drove away.

At that point, Davis ran over to Rodgers's body. She opened his coat and searched for money belonging to her. Davis also removed a small BB gun from Rodgers's waistband. She told the officers Rodgers did not pull the gun from his waistband before he was shot. When she was shown appellant's photograph, Davis identified appellant as the shooter. During the interview, Davis was "very anxious, nervous. She wanted to cooperate and told [the officers] that she was scared for her safety and welfare." She was "crying, fidgeting."

During a second interview in January 2003, Davis told Sergeants Dunakin and Longmire she had lied about her name during the first interview because she had witnessed a murder and was "scared." Davis believed "if they kill[ed] her boyfriend in front of her, that they wouldn't have any problems killing her." Sergeant Dunakin showed Davis a picture of appellant and she again identified him as the shooter. During an April 13, 2003 interview, however, Davis said she "l[ied] to the police, she did not really see the shooting, and her account of the shooting was based on what Monique Wells told her." In a February 2010 interview with Oakland Police Sergeant James Gantt and his partner, Davis claimed she "was on drugs" in 2003 did not remember "everything" that happened when Rodgers was shot. Davis admitted she gave a vivid description of the shooting during a previous interview, but she refused to testify at trial. She claimed she was "not about to snitch" when it would put her life, and her family's life, in danger.

At trial, Davis denied witnessing the murder. She claimed she was on drugs and a few blocks away when it happened; she told the police appellant was the shooter because

3

the "word was on the street that he did it[.]" Davis also claimed she told the police "what they wanted to hear" during her January 2003 police interviews because she "wanted to go home" and the police "wouldn't let [her] go." She testified she told Sergeant Gantt in February 2010 she "wasn't snitching on something [she] didn't know about." Davis testified she did not feel concerned about her safety and claimed she could not remember telling the police in January 2003 she was afraid of being physically harmed. She claimed she told Sergeant Dunakin her name was Tamika Green because she "was high." Davis also said no one threatened her, and that Laquisha Williams — appellant's wife — never asked her to change her story.[2]

*Laquisha's Interviews with Police and Her Trial Testimony*

Laquisha married appellant in late January 2003 and they had a son together. Sergeant Gantt interviewed Laquisha in 2010, and she told him appellant was with Rock and Beam when Rodgers was shot and that "the girl [who] went to school with QJ [ ] initially told on him." After the shooting, appellant told Laquisha to go to the murder scene and to "'get rid of that what's her name.'" Laquisha went to the place where Rodgers was shot. She told appellant to "get rid" of the murder weapon, so they drove over the Bay Bridge and appellant threw the gun in the bay. Laquisha did not know the make of the murder weapon because appellant had "a lot of guns" in 2003, but she knew it was a .40 caliber.

Laquisha told appellant to leave town and to take photographs with a backdated time and date stamp to create an alibi. Appellant followed Laquisha's advice. At some point after the murder, Laquisha visited Davis at her house and Davis "ended up changing her statement" about the murder. According to Laquisha, Davis changed her story because Laquisha "told her to" and because "[p]eople don't want to be labeled as snitch, they got to worry about [their] life."

During the interview, Laquisha also told Sergeant Gantt that the day before Osorio was shot in September 2009, appellant told her that Eddiebo "Dirt" Rodriquez was trying

---

[2]     Because appellant's wife and sister share the same last name, we refer to each by her first name.

4

to kill him; appellant told Laquisha not to ride in a car with Dirt. Early in the morning on September 19, 2009, Laquisha was riding in a Nissan Altima with two men, including her brother Osorio, who physically resembled Dirt. A Volkswagen or PT Cruiser pulled up next to the Altima and fired shots into it, hitting all three occupants and killing Osorio. Laquisha was shot in her shoulder, elbow, and hand. Laquisha recognized the shooter as appellant even though he wore a mask. When Laquisha called appellant the day after the shooting, he said: "that's the type of stuff that happen[s] when you hang around with people, innocent people get hit."

At trial, Laquisha denied going to the scene of Rodgers's murder, telling appellant to get rid of the murder weapon, and helping him dispose of it and create an alibi.[3] Laquisha also testified she lied to the police when she said appellant shot Osorio; she claimed she did not know who shot him and that she told Sergeant Gantt appellant shot Osorio because she heard it on "the streets" and because Sergeant Gantt put the idea into her head. Laquisha also said she "fabricated" the story about appellant having "a lot of guns" in 2003 because she had been falsely convinced by people "on the street" that appellant had killed Osorio.

At trial, Laquisha admitted she talked to Davis after Rodgers died, but claimed she did not make Davis change her story. Laquisha testified she spoke to Davis "to make sure [Davis] had her story correct, that [appellant] was not a part of" the Rodgers murder. After Laquisha talked to her, Davis "got her story straight." Laquisha claimed she did not discuss appellant's case during jailhouse telephone conversations with appellant.

*Appellant's Telephone Calls from Jail*

After the police arrested appellant in February 2003, appellant made several recorded phone calls from jail.[4] During one telephone call, appellant asked his sister,

---

[3]    Laquisha had several prior felony and misdemeanor convictions. She testified that when police questioned her in 2010, she had been arrested for murder and was kept in a small room for almost 30 hours, handcuffed to a desk. After Laquisha implicated appellant in Rogers's murder, she was not charged with murder.

[4]    The prosecution played a recording of the January 2003 interviews for the jury. The prosecution also played a recording of appellant's jailhouse telephone calls.

Quinosha Williams, if she had spoken to a person he could not name. Quinosha said, "Yeah" and appellant asked, "[w]hat they say, they gonna do it?" Quinosha replied "Yeah," and appellant responded, "they gonna have to man." He also said, "I heard . . . that's the only one . . . so if that happens it'll be cool." During another telephone call, appellant told a man "they need to uh, you know" and the man agreed and appellant said, "Yeah, 'cause, man they need to'" and that the "Mother [expletive] need to do that . . . within these next 60."

In a third call, appellant asked Quinosha whether she had "talked to my family" and whether Quinosha "let her know what . . . I told you when I was downtown[.]" When Quinosha asked appellant to whom he was referring, he said, "you know . . . out the way[.]" Quinosha replied, "Oh yeah" and appellant said, "Because you know they gon, ah, talk and [expletive], gon try to find out. . . . [t]o go, ah, talk to her and [expletive]." When Quinosha mentioned "'Beamer' and Rock[,]'" appellant told her, "Shut up man. Don't say that. Dude . . . don't say nothing about him." In another call, Quinosha told appellant she "touched bas[e]s" with "her broad yesterday and . . . I let her know. . . . [t]hat we ain't playing." In response, appellant said, "[h]ell yeah."

In another conversation, Laquisha asked appellant about "[t]he witness . . . [t]he person who could say that you did something." Appellant responded, "I still . . . I ain't trippin' off that." In another call, a woman asked appellant, "Do you still want me to — if I see that girl say that right" and appellant answered, "Yeah." The woman said, "I'm probably gonna see his girlfriend" and appellant said, "Man don't even say nothin' like that on this phone, bud. That [expletive] ain't cool. Dude, but I'm tellin' you it ain't cool." In another call, appellant and Laquisha discussed the preliminary hearing and appellant said, "when don't nobody show up I'm only [going] to be in here" for another few months.

*Verdict and Sentencing*

The jury convicted appellant of the first degree murder of Rodgers (Pen. Code, § 187, subd. (a) (Count One)) and found the firearm sentencing enhancements true (Pen. Code, §§ 12022.5, 12022.7, 12022.53). The jury found appellant not guilty of Counts

6

Two through Seven, the charges arising out of Osorio's death.  The court sentenced appellant to an aggregate prison term of 50 years to life.

DISCUSSION

I.

*The Denial of Appellant's Severance Motion Was Not An Abuse of Discretion*

Appellant contends the court erred by denying his motion to sever the Rodgers murder charge (Count One) from the charges relating to Osorio's death (Counts Two through Seven).  In his motion to sever, appellant claimed trying the cases together would prejudice him because the evidence was not cross-admissible, each case was weak, and because evidence about the Osorio shooting would "inflame the passions of the jury and further prejudice [the jury] against [him]."  In opposition, the prosecution argued the charges involved "the same defendant and the same criminal offenses which were similarly committed as part of the same pattern of criminal conduct."

Following a hearing, the court denied the motion.  It determined "the spill over effect" would not "be prejudicial to the point of outweighing the consolidation" and that the evidence was not particularly inflammatory.  The court explained, "this is exactly the type of case that should be consolidated.  It involved the exact same type of charge.  Quite frankly, it involves death in the same manner, somebody unexpectedly shooting somebody else with a gun here on our streets, it involves showing up in sort of a pack . . . with others.  And it involves the same cast of characters, if you will, in the sense that . . . the one witness who is a victim from '09 is a substantial witness in the '03, depending upon what the jury believes.  So I am finding that this is a proper case for consolidation under Penal Code Section 954 for the reasons stated, and so the Defense motion is denied."

Penal Code section 954 expresses the legislative preference for joint trials of similar offenses committed by a defendant.  (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 557 (*Sullivan*).)  Where, as here, "'the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion.'  [Citation.]  "'"'The burden

7

is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.] . . .' [Citation.]'" (*Id.* at p. 557.)

"'We review the trial court's ruling for abuse of discretion, which will be found "when the trial court's ruling "'falls outside the bounds of reason.'"" [Citation.]' [Citation.] 'In determining whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling.' [Citation.] ""The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.] . . . [Citation.]'" 'The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citations.]" (*Sullivan, supra,* 151 Cal.App.4th at p. 557.)

Appellant concedes the murder charges satisfy the statutory requirement for joinder because they are of the same class of cases; he claims, however, the denial of his motion to sever Count One — the charge relating to the shooting of Rodgers — from Counts Two through Seven — the charges relating to Osorio — "was an abuse of . . . discretion and a violation of [his] constitutional due process right to a fundamentally fair trial." According to appellant, severance was appropriate because the evidence supporting the charges was not cross-admissible "in a separate trial on the charged murder of [ ] Rodgers." Assuming for the sake of argument the evidence was not cross-admissible, appellant's claim fails. That the evidence would not be cross-admissible in separate trials does not, by itself, "establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges. [Citation.] Indeed, [Penal Code] section 954.1 . . . codifies this rule—it provides that when, as here, properly joined charges are of the same class, the circumstance that the evidence underlying those

8

charges would not be cross-admissible at hypothetical separate trials is, standing alone, insufficient to establish that a trial court abused its discretion in refusing to sever those charges." (*People v. Soper* (2009) 45 Cal.4th 759, 775; *People v. Myles* (2012) 53 Cal.4th 1181, 1201 (*Myles*) ["lack of cross-admissibility is not dispositive of whether the court abused its discretion in denying severance"].)

Appellant also argues the evidence pertaining to the crimes arising out of the Osorio shooting "was unusually likely to inflame the jury against [him], because it suggested that [he] was indiscriminately firing shots" at a car occupied by his wife. According to appellant, evidence that appellant would shoot his own wife while trying to kill a rival would have "a more emotional impact" on the jury than the evidence concerning the shooting of Rodgers. We are not persuaded. The shooting of Osorio "was no less inflammatory" than the callous, cold-blooded style killing of Rodgers. (*Myles, supra,* 53 Cal.4th at p. 1202 [rejecting claim the evidence relating to one of two murder charges "was likely to inflame the jurors against" the defendant].) In addition, the evidence underlying both shootings was "'similar in nature and equally gruesome.'" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1227, quoting *People v. Carter* (2005) 36 Cal.4th 1114, 1155 (*Carter*).)

Finally, appellant claims joinder of Count One with Counts Two through Seven was erroneous because "the evidence pertaining to both charged murders was weak." We disagree. Immediately after Rodgers was shot, Davis identified appellant as the shooter and her description of the shooting was largely consistent with the physical evidence. Laquisha identified the murder weapon and told police she helped appellant dispose of it and create an alibi. She also admitted pressuring Davis to change her story. In addition, Laquisha told police she witnessed the Osorio shooting and identified appellant as the shooter. Finally, appellant's jailhouse telephone calls demonstrated his desire to pressure Davis to change her story so no one would testify against him. We conclude the court did not abuse its discretion by denying appellant's severance motion.

9

## II.

*The Court Did Not Abuse Its Discretion by Admitting Sergeant Dunakin's Preliminary Hearing Testimony*

Sergeant Dunakin was killed in the line of duty before appellant's trial and the court admitted his preliminary hearing testimony at trial pursuant to section 1291. Appellant contends the court erred by admitting Sergeant Dunakin's preliminary hearing testimony at trial. According to appellant, Sergeant Dunakin's testimony relating what Davis told him about the Rodgers murder was inadmissible at trial pursuant to section 1291 because the defense was not "similarly interested and motivated to cross-examine Dunakin at the preliminary hearing as it was at trial[.]"

A. Sergeant Dunakin's Preliminary Hearing Testimony and the Defense Motion to Exclude It

At a 2003 preliminary hearing, Sergeant Dunakin testified he interviewed a woman named Tamika Green on January 5, 2003, the day Rodgers was shot. Green told Sergeant Dunakin "Isom Rodgers was the father of her child and they were boyfriend-girlfriend or very close." She told Sergeant Dunakin that immediately before the shooting, she "was standing in the 3000 block of West Street on a sidewalk in front of 3017 West" with Rodgers and two other women. "She said that a tan Buick [or] Olds[mobile] four-door vehicle pulled up and parked in front of 3107 West[.]" According to Green, appellant — also known as Q.J. — was driving the car. Beam, or Beamer, was in the front passenger seat and Rock was in the backseat. Green had known appellant since middle school.

Sergeant Dunakin further testified Green told him that the "[v]ehicle pulled up" and appellant "immediately got out of the vehicle and met with Isom Rodgers who stepped out on the sidewalk. . . . Beamer and Rock also got out of their car and walked up to where Q.J. was at, who was . . . facing Isom in the street." "She said that Rock and Beam kind of formed like a semicircle around Isom" and that appellant was in the middle of the semicircle, facing Rodgers. "She said that suddenly Quinton pulled a — what she

10

described as a black police-type pistol from his waistband and pointed it at Isom and shot." "She said that . . . Isom started to run . . . and that the other two started to shoot. All three shot." Rodgers "collapsed near the corner at 31st and West Street." The three men stopped shooting, "ran back into the car . . . and then drove off[.]" Green "ran across the street to where Tank collapsed, or Isom Rodgers." She told Sergeant Dunakin she ripped open Mr. Rodgers' coat and "removed a small gun from his waistband that she believes was a BB gun." Green gave the gun to her cousin. Sergeant Dunakin explained he showed Green a picture of appellant and "she immediately identified [appellant] and signed the back of the photograph."

Sergeant Dunakin also testified he eventually learned Green's "true name was Donna Davis." Sergeant Dunakin testified he interviewed Davis again on January 14, 2003. She told Sergeant Dunakin "she'd lied on [January] 5th, that her true name was Donna Davis, and that she was frightened and scared. It was her belief that if they killed her boyfriend in front of her that they wouldn't have any problems killing her." Later in the interview, however, Sergeant Dunakin showed Davis a picture of appellant and she said it "was Quinton Williams, Q.J." and that he "had produced a gun and shot Tank, or Isom Rodgers."

Appellant's counsel conducted a lengthy examination of Sergeant Dunakin. Counsel questioned Sergeant Dunakin about the January 5, 2003 interview, and about Davis's demeanor during the interview. On cross-examination, Sergeant Dunakin testified Davis was "very anxious, nervous. She wanted to cooperate but told us several times that she was scared for her safety and welfare." Initially, Davis was "crying, fidgeting" but she "started to calm down and relax, and the portion of the interview when we went on tape . . . she was rather calm compared to where she was when we first met her." Sergeant Dunakin concluded Davis "didn't appear to be under the influence of anything other than the emotional strain" of having seen "the father of her child . . . murdered."

Sergeant Dunakin also testified on cross-examination that the details Davis gave about the shooting "seemed — or appeared to match with the physical evidence that was

11

recovered at the scene and consistent to what [the] physical evidence showed [ ] at that time." He asked Davis about what appellant was wearing on the day of the shooting, but he did not put that information in his police report. Davis also told Sergeant Dunakin "[s]he was looking for money" when "she pulled open [Rodgers's] jacket" after he collapsed. Davis, who was homeless, said she knew "that if she didn't get the money at that time she'd probably never see it again" after the police began investigating the shooting. When Sergeant Dunakin drove Davis "back after the interview" she talked about "the Milton Street . . . gang or people involved in the narcotics activity out there, how violent they can be, as well as Ghost Town, which is another area of Oakland, and she was quite concerned."

On cross-examination, Sergeant Dunakin conceded he showed Davis a single picture of appellant, rather than a group of six photographs, during the January 5, 2003 interview. He explained why he used only one picture instead of the customary kind of photographic lineup. Sergeant Dunakin also testified he showed Davis a single picture during the second interview on January 14, 2003 and that his "follow-up investigation report" incorrectly stated he showed her two photographs. According to Sergeant Dunakin, he asked Davis to identify appellant again during the second January 2003 interview because "she wasn't truthful on her name, so I . . . thought it would benefit the investigation to at least make sure that this was the same person that she was referring to[.]" During the January 14, 2003 interview, Davis expressed concern that she would "be killed" if she testified against appellant.

As we have noted, Sergeant Dunakin was killed in the line of duty before appellant's trial; the prosecution indicated it planned to introduce his preliminary hearing testimony at trial. Appellant moved to exclude the preliminary hearing testimony, arguing: (1) Davis's statements to Sergeant Dunakin were inadmissible under Penal Code section 872; and (2) Sergeant Dunakin's testimony did not satisfy the requirements of section 1291 because defense counsel's "intent and motive" for cross-examining Sergeant Dunakin at the preliminary hearing was "essentially discovery — to elicit as much . . .

12

bad evidence against his client as he could from all prosecution witnesses" whereas the motive at trial — to attack Davis's credibility — was different.

After reviewing supplemental briefing and conducting several hearings, the court determined Sergeant Dunakin was unavailable pursuant to section 240 and that he was cross-examined at the preliminary hearing "with an interest and motive similar to that presented at this trial." The court allowed the prosecutor to impeach Davis with Sergeant Dunakin's preliminary hearing testimony relating Davis's statements to him. The court ruled on the admissibility of Sergeant Dunakin's preliminary hearing testimony line by line.

At trial, Davis denied witnessing Rodgers's murder and claimed she lied to police when she identified appellant as the shooter. The prosecution then read Sergeant Dunakin's preliminary hearing testimony to the jury. The court instructed the jury that Davis's statements concerning her fear of appellant and his involvement in narcotics activity were admissible for the limited purpose of determining her state of mind and the credibility of her statements, "certainly not to be considered . . . for the purpose of determining whether the content . . . is true."

B.    The Court Did Not Err by Admitting Sergeant Dunakin's Preliminary Hearing Testimony

As noted above, appellant contends the court abused its discretion by admitting Davis's "hearsay statements offered at the preliminary hearing through Sergeant Mark Dunakin's testimony." We disagree. As we explain below, Sergeant Dunakin's preliminary hearing testimony was admissible pursuant to section 1291 and Davis's statements to Sergeant Dunakin were admissible as prior inconsistent statements under section 1235. (*People v. Alcala* (1992) 4 Cal.4th 742, 782-783 & fn. 18.)

Sergeant Dunakin's preliminary hearing testimony was admissible pursuant to section 1291, which provides a hearsay exception for former testimony. "The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) That right is not absolute, however. An exception exists when a

13

witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination." (*People v. Cromer* (2001) 24 Cal.4th 889, 892.) "In California, the exception to the confrontation right for prior recorded testimony is codified in section 1291, subdivision (a), which provides: 'Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'" (*Id.* at p. 898.)

Here, Sergeant Dunakin's "death rendered him unavailable to testify at trial." (*People v. Harris* (2005) 37 Cal.4th 310, 332 (*Harris*).) In addition, the defense had a similar interest and motive for cross-examining Sergeant Dunakin at the preliminary hearing as it did at trial. (§ 1291, subd. (a)(2).) Defense counsel's "in-depth cross-examination" of Sergeant Dunakin at the preliminary hearing was "twice as long as the direct examination" and was geared toward attacking Sergeant Dunakin's investigation *and* discrediting Davis's account of the shooting. (*Harris*, *supra*, 37 Cal.4th at p. 333.) During cross-examination, defense counsel questioned Sergeant Dunakin about his failure to show Davis a full photographic lineup and his failure to put certain information in his police reports. Counsel also asked Sergeant Dunakin about: (1) Davis's demeanor during the interview; (2) her vague description of clothing and appellant's car; and (3) her conduct after the shooting. Defense counsel also asked Sergeant Dunakin to provide details about the alleged threats made toward Davis, and confirmed Davis lied about her name. Defense counsel's motive at the preliminary hearing — and at trial — was to try to discredit Davis's account of the shooting and to attempt to undermine Sergeant Dunakin's credibility by suggesting he did not perform the investigation properly.

Appellant argues Sergeant Dunakin's preliminary hearing testimony did not come within the section 1291 hearsay exception because trial counsel cross-examined Sergeant Dunakin at the preliminary hearing with a motive to "discover all the damaging evidence" against appellant, whereas "the defense at trial" was to "undermine the

credibility of the evidence of Davis's accusations against [him] in the eyes of the jury." We are not persuaded. "[A] defendant's motive in cross-examining a witness at a preliminary hearing may differ somewhat from the motive at trial, but nevertheless the earlier testimony may be admissible at the trial under section 1291 because the "motives need not be identical, only 'similar.'" [Citations.]" (*Carter, supra,* 36 Cal.4th at p. 1173; *Harris, supra,* 37 Cal.4th at p. 333.) "'[A]s long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony under . . . section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective.'" (*Carter*, *supra,* 36 Cal.4th at pp. 1173-1174.) Here, defense counsel had ample opportunity to cross-examine Sergeant Dunakin, and availed himself of that opportunity. That the defense focused more on Davis's credibility at trial than at the preliminary hearing does not render the preliminary hearing testimony inadmissible. We conclude the court did not err by admitting Sergeant Dunakin's preliminary hearing testimony pursuant to section 1291. (*People v. Valencia* (2008) 43 Cal.4th 268, 293-295 [no error in admitting preliminary hearing testimony pursuant to section 1291]; *Harris, supra,* 37 Cal.4th at p. 333 [preliminary hearing testimony was admissible under section 1291].)

We also conclude Davis's statements to Sergeant Dunakin were admissible as prior inconsistent statements under section 1235. "A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in . . . sections 1235 and 770. The 'fundamental requirement' of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219, fn. omitted.)[5] Here, Davis's statements to Sergeant Dunakin were plainly inconsistent with her trial testimony.

---

[5] Section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Section 770 provides: "Unless

15

Appellant's reliance on *People v. Thoma* (2007) 150 Cal.App.4th 1096 (*Thoma*) and *People v. Best* (1997) 56 Cal.App.4th 41 (*Best*), abrogated on another ground in *People v. Golde* (2008) 163 Cal.App.4th 101, do not alter our conclusion. In *Thoma*, the police officer's preliminary hearing testimony came within the section 1291 hearsay exception, but the nurse's statement to the officer "did not fall within any exception to the hearsay rule. The officer's testimony, therefore, was inadmissible[.]" (*Thoma, supra,* 150 Cal.App.4th at p. 1103.) Similarly, in *Best*, the police officer's preliminary hearing testimony was inadmissible where the victim's statements to the police officer did not come "within an exception to the hearsay rule." (*Best, supra,* 56 Cal.App.4th at p. 46.) Here, Sergeant Dunakin's preliminary hearing testimony *and* Davis's statements to Sergeant Dunakin came within a hearsay exception. As a result, *Thoma* and *Best* have no application here and the court did not err by admitting the challenged testimony.

### III.

*The Court Did Not Err by Admitting Evidence Regarding Appellant's Possession of Guns and Any Error in Declining to Give a Limiting Instruction Was Harmless*

Next, appellant claims the court erred by admitting "irrelevant and prejudicial evidence that [he] possessed a lot of guns" in 2003 because it allowed the jury to infer he "was a person of bad character with a disposition to commit crimes."

A. Laquisha's Statement that Appellant "Had a Lot of Guns"

During a February 2010 interview with Sergeant Gantt, appellant's wife, Laquisha, said appellant had "several" guns in 2003. When Sergeant Gantt asked Laquisha whether the gun she saw appellant "throw away" after the Rodgers shooting was a "gun that he had had for some time," she answered, "No." The officer asked, "Do you know how long he had it?" and Laquisha responded, "I don't know, he had a lot of guns." Before trial, appellant moved to exclude Laquisha's statement that appellant "had

---

the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

a lot of guns," contending it was irrelevant, "highly prejudicial[,]" and "open[ed] up speculation by the jury." The court overruled the objections. It determined Laquisha's statement "explain[ed] her knowledge of how long or why she doesn't know how long he had [the gun]" and had "a tendency and reason to go to the credibility of her statements regarding him having several guns and this gun in particular." The court also concluded the "cumulative effect" of the statement did not "outweigh the probative value" of Laquisha's statement.

At trial, the prosecutor asked Laquisha if she knew whether appellant had a lot of guns on January 5, 2003.[6] Laquisha responded, "Not that I know of." When asked again about appellant's possession of guns during that time period, Laquisha responded, " I don't know." Laquisha testified she lied during the February 2010 interview. She also denied going to the murder scene at appellant's request, telling appellant to get rid of the murder weapon, and helping him dispose of it and create an alibi. At that point, the prosecutor played a recording of Laquisha's police interview and asked her about her statement that appellant had "a lot of guns." In response, Laquisha conceded she made the statement. She testified, however, that she "fabricated that story."

B.      The Court Did Not Err by Admitting Evidence of Appellant's Possession of "a Lot of Guns" in 2003

Appellant contends the court should have excluded evidence he had "a lot of guns" in 2003 because it was irrelevant and unduly prejudicial. We review the court's admission of the evidence for abuse of discretion. (*People v. Panah* (2005) 35 Cal.4th 395, 474.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)

---

[6]      Defense counsel renewed his objections and the court overruled them, concluding Laquisha's statement was relevant, and that any prejudicial effect did not outweigh the probative value of the evidence: "It is not going to confuse the jury, and . . . it goes straight to his knowledge and his ability to possess the guns and have them, and ultimately what we expect the testimony would be is that she helped him get rid of at least one of them." Defense counsel objected several other times, preserving appellant's objections on appeal.

17

"Evidence a defendant possessed weapons that were not used to commit a crime is inadmissible to show the defendant committed the crime. [Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 928 (*Abel*).) Here, the evidence was used for a different purpose: to prove appellant had access to the murder weapon and a means to carry out a plan to kill Rodgers. Appellant was charged with first degree murder and premeditation was a disputed fact. (*People v. Jablonski* (2006) 37 Cal.4th 774, 821-822 [homemade handcuffs and stun gun found in the defendant's car, but not used in the murder, were relevant to show premeditation and deliberation].)

The evidence was also relevant to Laquisha's credibility in her statements during the February 2010 police interview. Evidence that Laquisha had seen appellant's guns — and that he had a lot of them — explained why she recognized the gun appellant used to kill Rodgers but was unable to identify the make of the gun. Moreover, the evidence was relevant to impeach Laquisha's trial testimony. When Laquisha recanted her statements that she saw the murder weapon and helped appellant dispose of it, her statement during the police interview that appellant "had a lot of guns" was relevant to impeach her. (§ 1235.) "That the evidence was not admissible to show [appellant] committed a criminal act did not prevent it from being admitted" for another purpose. (*Abel, supra,* 53 Cal.4th at p. 928.)

Relying on *People v. Henderson* (1976) 58 Cal.App.3d 349 (*Henderson*), appellant contends the court erred by admitting evidence that he had "a lot of guns" in 2003 because it improperly suggested he "has a criminal disposition and is therefore guilty as charged." In *Henderson*, the defendant was charged with two counts of assault with a deadly weapon. (*Id.* at p. 351.) The trial court admitted evidence he had a loaded gun in his bedroom to prove his intent to commit the assaults even though the gun in defendant's bedroom was not used to commit the assaults. The *Henderson* court held the trial court should have excluded the evidence because it was irrelevant to the defendant's intent and was highly prejudicial: "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant*

18

consequence to [a] determination of the guilt or innocence of the defendant." (*Id.* at p. 360.)

*Henderson* is distinguishable. In *Henderson*, the parties agreed the defendant did not use the gun in his bedroom to commit the assaults. Here, there was no such agreement and the prosecution offered Laquisha's statements to police to demonstrate appellant used a gun from his collection to shoot Rodgers and disposed of the weapon with Laquisha's assistance. (*People v. Mills* (2010) 48 Cal.4th 158, 197 (*Mills*) [trial court did not err by admitting evidence of defendant's possession of "several cutting devices, any one of which could have been the murder weapon"].)

We also reject appellant's claim that the court should have excluded the evidence as "unduly prejudicial" pursuant to section 352. Evidence is prejudicial under section 352 if it "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Scheid* (1997) 16 Cal.4th 1, 19.) That appellant possessed "a lot of guns" is not the type of evidence that would uniquely evoke an emotional bias against appellant or that would cause the jury to decide the case against him, especially when compared to evidence of the execution-style shootings of Rodgers and Osorio. (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) Here, the trial court's decision to admit the evidence "was both reasoned and reasonable." (*Mills, supra,* 48 Cal.4th at p. 196.) "[H]aving found no error under . . . section 352, we also reject [appellant's] various "constitutional claims." (*Ibid.*) "The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.)

C. Any Error in Refusing a Limiting Instruction About Appellant's Gun Possession Was Harmless

Appellant argues the court erred by declining to give a limiting instruction concerning the evidence that he possessed "a lot of guns." According to appellant, the jury would have acquitted him of Rodgers's murder had the court instructed the jury not to rely on his possession of "a lot of guns" as propensity evidence. Assuming for the sake of argument the court erred in failing to give the requested limiting instruction, the

19

error is harmless because it would not have affected the outcome of the trial. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1054 [failure to give limiting instruction harmless when it "would not have significantly aided defendants under these facts or weakened the strength of the evidence of guilt the jury properly could have considered"]; *People v. Falsetta* (1999) 21 Cal.4th 903, 924 [failure to give limiting instruction was "clearly harmless"].) As noted above, Davis identified appellant as the shooter in two separate police interviews and Laquisha told the police she saw the murder weapon and helped appellant dispose of it. Appellant's assertion that the jury relied on the evidence "for the improper inference that [he] had a criminal propensity" is speculative.

V.

*Admitting Prosecution Evidence Regarding Witness Intimidation Was Not an Abuse of Discretion and Any Error Was Harmless*

Next, appellant argues the court erred by permitting two prosecution witnesses to testify about witnesses' reluctance to cooperate with police investigations and about intimidation of witnesses who do cooperate with such investigations.

At trial, Oakland Police Officer Hamman Nguyen testified he responded to the scene of the Rodgers shooting and canvassed the area but was unable to locate any witnesses. Officer Nguyen testified it is "not unusual at all" for witnesses to refuse to cooperate with a police investigation. Instead, Officer Nguyen stated it is "very common to come in contact with potential witnesses to a crime scene that are uncooperative." According to Officer Nguyen, witnesses are uncooperative because they fear retaliation. The court overruled defense counsel's relevance and hearsay objections. Officer Nguyen then explained, "I have contacted numerous witnesses, victims of crimes, [and it is] extremely common for them to tell me that they're afraid of retaliation from the people that have committed these crimes. . . ." Defense counsel objected and the prosecutor made an offer of proof that Officer Nguyen's testimony regarding the reason certain witnesses are uncooperative was not offered "for the truth of the matter asserted, but rather to explain the basis of his opinion that individuals fear retaliation by cooperating

20

with the police."  The court overruled defense counsel's hearsay objection and admitted the testimony for that limited purpose.

Sergeant Gantt opined "[i]t's common for victims and witnesses not to cooperate" with police investigations.  Over defense counsel's objection, the court allowed Sergeant Gantt to testify that "[o]ftentimes when people are witnesses to murders . . . they don't want to come forward and talk to the police . . . because they fear coming in court because the suspect's family and friends are sitting out in the audience [and] oftentimes will come in and intimidate witnesses or follow witnesses back to their car or find out where witnesses live. . . . Oftentimes family members retaliate against the person who killed their loved one[.]"

Without citing any authority, appellant contends the officers' testimony "about what had happened in their other cases was irrelevant to [his] case."  We reject this claim because it is unsupported by any authority.  (*People v. Anderson* (2007) 152 Cal.App.4th 919, 929 ["A point not . . . supported by citation to authority is forfeited"].)  We also conclude appellant's claim has no merit.  Here, the officers' "testimony was relevant to help the jury decide which version of the testimony was truthful: [Davis's] initial identifications of [appellant] as the shooter, and . . . or the later repudiations of those identifications and that statement.  'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.]  An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court.  [Citations.]" [Citations.]  Evidence of possible intimidation would help explain why the witnesses might repudiate earlier truthful statements."  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944 (*Gonzalez*); *Abel, supra,* 53 Cal.4th at p. 925 [evidence of threats of retaliation against witness and her family was relevant where witness's "credibility was a significant issue" in the case].)

Nor are we persuaded by appellant's claim that the officers' opinions constituted impermissible expert opinions because "jurors were fully capable of deciding whether Davis and Laquisha may have recanted their statements implicating [him] out of fear[.]"

21

"[A]lthough expert testimony is generally inadmissible on topics 'so common' that jurors of ordinary knowledge and education could reach a conclusion as intelligently as the expert, an expert may testify on a subject about which jurors are not completely ignorant. [Citations.]  In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.' [Citations.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 45; see also Simons, Cal. Evidence Manual (2014 ed.) § 4:7, pp. 295-297, citing cases.)  Here, evidence of a culture of witness intimidation would help the jury assess Davis and Laquisha's credibility and explain why they recanted at trial.  (*Gonzalez, supra,* 38 Cal.4th at p. 946 [court did not err by admitting expert testimony on gang culture and psychology, including witness intimidation].)

Assuming for the sake of argument the court erred by admitting Officer Nguyen and Sergeant Gantt's testimony, any error is harmless.  The jury heard evidence about witnesses' reluctance to cooperate with police investigations and testify in court when Laquisha testified that Davis changed her story because "[p]eople don't want to be labeled as snitch, they got to worry about [their] life."  The jury also heard Davis's statement to police in 2010 that she would not "snitch" and put her life, and her family's life, in danger.

V.

*Striking Defense Counsel's Argument Was Not An Abuse of Discretion and Any Error Was Harmless*

Next, appellant contends the court "committed reversible error when it struck the defense argument to the jury concerning the lack of evidence that the prosecution made any effort to obtain a crucial eyewitness's account" of the Rodgers shooting.

A.    Defense Counsel's Argument Regarding Monique Wells

In her initial January 5, 2003 police interview, Davis said she, Monique Wells, and Wells's sister were standing with Rodgers on sidewalk when appellant shot Rogers. Wells and her sister did not testify at trial.  The parties stipulated that during an April 2003 interview, Davis "admitted to lying to the police, she did not really see the shooting,

22

and her account of the shooting was based on what Monique Wells told her." In its summation, the prosecutor reminded the jury that Davis recanted her description of the shooting and said her description was based on what Wells told her.

In its summation, defense counsel argued: "Now I want to talk about Monique Wells because she is the young woman who Donna Davis first said was with her at the scene, and then said in this statement to the police . . . I think, April '03 — she heard it from Monique Wells, heard what happened. [¶] And the testimony in trial, she doesn't remember who told her. Well, it's interesting, I'm sure when it comes to Monique Wells, the District Attorney is going to say, 'You know what happened with her. We went to talk with her, she didn't see anything and she wouldn't cooperate.' [¶] "Where is the evidence? Where is the evidence that somebody who went to look for Monique Wells, where is the evidence that anybody cared to interview her to see what she had to say? [¶] Or her sister. Where is the evidence that police bothered, whether it was Longmire or Dunakin, or somebody working with him, asking him to go out and look for her, took a statement, or the D.A. investigator? [¶] So, see what is said about it, what is proved; but we know there's no interview with her about what she is saying."

The prosecutor objected that defense counsel "completely misstat[ed] the law and the facts." Outside the presence of the jury, the prosecutor complained that defense counsel knew — from the discovery packet containing a tape-recorded telephone call from Wells — that "Sergeant Dunakin, contacted her and she refused to cooperate. So to suggest that the police never followed up and contacted her when [defense] counsel knows that's not the case is inappropriate." The court determined defense counsel's argument was unsupported by the evidence. As the court explained, "[t]hat's not arguable at this point because we know nothing about why Monique Wells has not been called as a witness at this point [from] an evidentiary standpoint."

The court also decided it would advise the jury to disregard defense counsel's argument with respect to Wells and any statements that the prosecutor might make in that regard. When defense counsel asked whether he was precluded from talking about Wells, the court stated "there are certainly appropriate ways for you to argue that without

23

bringing in conversations about Monique Wells that aren't before the Court . . . ." Defense counsel agreed "[t]hat was a mistake."

The court advised the jury it was striking defense counsel's argument about Wells's absence from trial. When defense counsel resumed his closing argument, he told the jury: "Ladies and gentlemen, let me read this: Either side can choose to call who they want, and the District Attorney has the burden of proof, and he has the burden to corroborate, I believe, the testimony that he wants you to believe of Donna Davis. And it is up to the government to see who they will call, and you know what people have been called to testify."

B.     The Court Did Not Err by Limiting Defense Counsel's Argument and Any Error Was Harmless

Appellant contends the court abused its discretion by striking defense counsel's argument regarding Wells. According to appellant, the argument was "appropriate and lawful because it simply asked the jury to consider the prosecution's failure to present any evidence about efforts to get eyewitness Monique Wells to testify at trial." We review the court's ruling limiting trial counsel's argument for abuse of discretion. (*People v. Marshall* (1996) 13 Cal.4th 799, 855.)

The court properly sustained the prosecutor's objection and struck trial counsel's argument because "[n]othing in the record indicated [Wells was] available. It is axiomatic that counsel may not state or assume facts in argument that are not in evidence." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 102.) A party may comment on the absence of logical witnesses (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275) but the trial court has a duty to prohibit the parties from arguing a theory or matter unsupported by the evidence. (Pen. Code, § 1044; *People v. Modesto* (1967) 66 Cal.2d 695, 707-708, disapproved on another point in *Maine v. Superior Court* (1968) 68 Cal.2d 375, 383, fn. 8.) Here, defense counsel argued facts that were not before the jury — i.e., the prosecution's failure to interview Wells and compel her to testify and by inference the lack of effort by the police to obtain eyewitness testimony from Wells. The court properly struck the argument. (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1390.)

24

Additionally, any error in striking defense counsel's argument was harmless because, as appellant concedes, counsel was able to highlight the lack of eyewitness testimony implicating appellant in the Rodgers shooting without referring to Wells. As defense counsel argued to the jury, "There is no evidence that supports Donna Davis for corroboration. There is none other than if you look at the jail calls. There is nothing that says we don't even know how many people are out there, what kind of car they used, how many guns there were, where they parked the car. Everything comes from Donna Davis. There are no other witnesses and there's no physical evidence that tells us anything other than the number of the casings and the caliber of the gun. There is absolutely nothing. [¶] So, given what we know about her, given that she's admitted lying, given that she was an admitted drug user, given that she's been told multiple statements or testimony, one would expect in a serious case like this that there would be corroboration."

VI

*The Court Did Not Err by Refusing To Discharge a Juror For "Actual Bias"*

Appellant's final argument is the court erred by refusing to discharge Juror No. 15 for "'actual bias.'"

A.      Defense Counsel's Challenge of Juror No. 15 for "Actual Bias"

During the prosecution's case, Juror No. 15 told the court a spectator in the courtroom — who seemed familiar — was "looking" at him and making him "uneasy." Juror No. 15 also told the court that his supervisor at work told him, "I am hoping that you are not on Isom Rodgers's son's jury." Juror No. 15 asked his supervisor "[W]ho is Isom Rodgers?" and said he did not know him. His supervisor said Isom Rodgers — the victim's father — worked as a forklift driver in the same location where Juror No. 15 drove a truck. Juror No. 15 told the court that he did not "know the guy. I don't talk to him" but that he deduced the courtroom spectator was the victim's father.

The court asked Juror No. 15 whether the fact that he worked with the victim's father "in any way" affected his ability to be fair and impartial to either side in the case. Juror No. 15 said, "I don't think so, but sometimes, it came up to my mind . . . that what

25

about the decision." The court explained that the juror's decision could not be based on the fact that he and the victim's father were coworkers. The court then asked, "Is it going to make you feel so uncomfortable that you are not going to fulfill your responsibilities as a juror? That's the real question. Can you, despite the fact that you now know that this is someone who might work for your company, fulfill the roles and responsibilities as a juror, which is that you have to base your decision solely on the evidence? It can't be based on sympathy, bias, prejudice, conjecture, any of that stuff, or the fact that one of the victims' fathers may work for your company."

Juror No. 15 revealed his worry that he passed the area where the crime took place on his way to work and that appellant or others involved in the trial might see him as he drove through the area. The court told the juror to go a different route during the trial, and again asked him whether there was anything about his familiarity with the area that would prevent him from being a fair, open-minded, and impartial juror. Juror No. 15 responded, "[t]here is nothing for sure" but said he was a little uncomfortable that people might recognize him.

The court asked Juror No. 15 whether there was anything about the fact that he might be uncomfortable driving over there, depending on the decision in the case, that would prevent him from listening to the evidence, or from being open-minded and impartial. The juror responded, "I'm not afraid. I am just uncomfortable." He said, "I will be impartial" and stated, "I think I could be fair." When the court asked, "Are you sure it doesn't impact your decisions here" Juror No. 15 responded, "I am sure."

The court then summarized the discussion: "So we have covered a couple of things here: one, the fact that you are familiar with the area, but that doesn't seem to me, in my view, to be an issue about your ability to go forward; and then second, with respect to your again having become aware of the fact that . . . the victim['s] father works at the same company as yours, you are certain, and can you assure myself and counsel that that

knowledge is not going to, in any way, impact your decisions or influence you in any way in this case?" The juror responded, "Yes."[7]

Defense counsel asked Juror No. 15 if it would be harder for him to vote not guilty because he "would have to face [the victim's] father." The juror responded, "I don't think so. Like I said, I will be fair. It just happened that we work in the same company, so I just — I just want you to know." Juror No. 15 again confirmed he did not know the victim's father and had never spoken with him. Defense counsel challenged Juror No. 15 for cause. Despite describing Juror No. 15 as "clearly honest" and "wonderful," defense counsel explained he would have challenged the juror had he known Juror No. 15 worked in the same place as one of the victims' father. In response, the prosecutor noted Juror No. 15 came forward in a "straightforward and honest" way, and said he could be "unequivocally fair and impartial" while listening to the evidence. The prosecutor also noted the two men had never been in contact, and they did not work in a small "ma and pa shop" but rather at "the largest unionized employer in the country."

The trial court denied defense counsel's motion, concluding Juror No. 15 "made it very clear in a very candid way, and I do believe his statements, that he will not let this affect him at all."

B.     The Court Did Not Err by Refusing to Discharge Juror No. 15

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it."' [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) 'The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is unable to perform his or her duty. ([Pen. Code,] § 1089.)

---

[7]     The juror then speculated that the victim's father probably talked to his supervisor. The trial court told Juror No. 15 that he could find out after the trial. The court also told the juror to immediately tell his boss "judge says no conversation" if his supervisor tried to talk about the case again. The court spoke with the victim's father and asked him to keep it to himself if he recognized any of the jurors.

"When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. [Citations.]" [Citation.] . . . "Grounds for investigation or discharge of a juror may be established by his statements or conduct . . . . [Citations.]" [Citation.] [¶] "A sitting juror's actual bias, which would have supported a challenge for cause, renders him 'unable to perform his duty' and thus subject to discharge and substitution. . . . ." [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 898 (*Homick*), quoting *People v. Lomax* (2010) 49 Cal.4th 530, 588-589.) A "juror's inability to perform as a juror must be shown as a "'demonstrable reality' [citation] which requires a 'stronger evidentiary showing than mere substantial evidence' [citation]." (*People v. Wilson* (2008) 44 Cal.4th 758, 821, quoting *People v. Cleveland* (2001) 25 Cal.4th 466, 474.) We review the court's refusal to discharge Juror No. 15 for abuse of discretion and find none. (*Homick, supra,* 55 Cal.4th at p. 899.)

Contrary to appellant's argument, the record amply supports the court's finding that Juror No. 15 was not biased. When the juror learned he worked with the victim's father, he notified the court and defense counsel described him as "honest" and "wonderful." He stated he could be fair and impartial; he also "made it very clear in a very candid way" that he would not let the fact that he drove near the crime scene and worked at the same company as the victim's father "affect him at all." Appellant's arguments to the contrary do not establish an abuse of discretion, nor does his reliance on *United States v. Allsup* (9th Cir. 1977) 566 F.2d 68 (*Allsup*). In *Allsup*, the Ninth Circuit Court of Appeals held that prospective jurors who worked for the bank the defendant robbed should have been excused for cause, noting, "[t]he potential for substantial emotional involvement, adversely affecting impartiality, is evident when the prospective jurors work for the bank that has been robbed. Persons who work in banks have good reason to fear bank robbery because violence, or the threat of violence, is a frequent concomitant of the offense. . . . The employment relationship coupled with a reasonable apprehension of violence by bank robbers leads us to believe that bias of those who work for the bank robbed should be presumed." (*Id.* at pp. 71-72.) Here, Juror No. 15 did not work at a bank that appellant robbed and, as a result, there was no "employment

28

relationship" between Juror No. 15 and appellant.  Nor was there a "potential for substantial emotional involvement" unique to potential jurors who work at banks.  As a result, *Allsup* has no application here.  We conclude the court did not err by refusing to discharge Juror No. 15.  (*People v. Manibusan* (2013) 58 Cal.4th 40, 56 [rejecting the defendant's claim that "a juror's fear of a defendant establishes bias or other grounds for discharge"].)

DISPOSITION

The judgment is affirmed.

_____
Jones, P.J.

We concur:

_____
Needham, J.

_____
Bruiniers, J.